# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE DIVISION
### 5:18-cv-00047-MR

| | | |
|---|---|---|
| ARTHUR JAY GOULETTE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM OF** |
| | ) | **DECISION AND ORDER** |
| MARTA KALINKSI, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**THIS MATTER** comes before the Court on the parties' motions for summary judgment [Docs. 73, 76].

## I.     PROCEDURAL BACKGROUND

Pro se Plaintiff Arthur Jay Goulette ("Plaintiff") was formerly a prisoner of the State of North Carolina, most recently housed at Mountain View Correctional Institution in Spruce Pine, North Carolina.  Plaintiff was recently released from prison and "at [the] last minute [was] ordered to [the] state mental hospital" in Goldsboro, North Carolina.  [Doc. 90].

Plaintiff filed a Complaint on March 16, 2018, pursuant to 42 U.S.C. § 1983.  [Doc. 1].  Plaintiff filed an Amended Complaint, alleging that his rights under the Eighth Amendment to the U.S. Constitution were violated by Defendant Marta Kalinski, M.D.'s deliberate indifference to Plaintiff's serious

medical needs while he was housed at Alexander Correctional Institution ("Alexander").[1]  [Doc. 12].  Plaintiff also purported to state claims for medical malpractice, retaliation, and civil conspiracy. [See id.].  Plaintiff seeks compensatory and punitive damages and injunctive relief.  [Id. at 5].  Plaintiff's Amended Complaint survived initial review under 28 U.S.C. §§ 1915(e)(2) and 1915A.  [Doc. 15].

Dr. Kalinski moved to dismiss Plaintiff's Complaint for failure to state a claim upon which relief may be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  [Doc. 30].  The Court denied this motion as to Plaintiff's Eighth Amendment claim for deliberate indifference to Plaintiff's serious medical needs and granted it as to Plaintiff's remaining claims.  [Doc. 46].

The parties have now moved for summary judgment.  [Docs. 73, 76].  The Court entered an order in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the summary judgment motions and of the manner in which evidence could be submitted to the Court.  [Doc. 79].  The Plaintiff was

---

[1] Plaintiff also named Benjamin M. Anderson, identified as the "Chief Medical Officer/Assistant Superintendent" of Alexander, as a Defendant in this matter, but later voluntarily dismissed Anderson as a Defendant.  [Docs. 53, 55].

specifically advised that he "may not rely upon mere allegations or denials of allegations in his pleadings to defeat a summary judgment motion." [Id. at 2]. Rather, he must support his assertion that a fact is genuinely disputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." [Id. at 3 (citing Fed. R. Civ. P. 56(c)(1)(a)]. The Court further advised that, "[i]f Plaintiff has any evidence to offer to show that there is a genuine issue for trial," "he must now present it to this Court in a form which would otherwise be admissible at trial, i.e., in the form of affidavits or unsworn declarations." [Id. at 2 (citing Fed. R. Civ. P. 56(c)(4))]. The parties timely responded to each other's motions [Docs. 75, 81] and Dr. Kalinski replied to Plaintiff's response [Doc. 86].

In support of his summary judgment motion, Plaintiff submitted various documents, including a "Statement of Undisputed Facts" [Doc. 73-2], a Memorandum in Support [Doc. 73-3], a "Declaration" submitted under penalty of perjury [Doc. 73-4], and 648 pages of his medical record[2] [Docs.

_____

[2] For purposes of summary judgment, medical records, the authenticity and admissibility of which are not challenged, may be considered part of the evidentiary forecast even when presented without an affidavit. See Jones v. Western Tidwater Regional Jail, 187 F.Supp.3d 648, 654 (E.D. Va. 2016).

3

73-5 through 75-8]. Dr. Kalinski responded to Plaintiff's motion, largely incorporating the materials she submitted in support of her own summary judgment motion. [See Doc. 75].

In support of her summary judgment motion, Dr. Kalinski submitted a Memorandum in Support [Doc. 77], a 55-page Declaration [Doc. 78], Plaintiff's Offender Movement Log [Doc. 78-2], Plaintiff's Offender Control History [Doc. 78-3], and 749 pages of Plaintiff's medical record [Docs. 78-4 through 78-46]. In response to Dr. Kalinski's motion, Plaintiff filed a "Statement of Disputed Factual Issues" [Doc. 81], a "Brief in Opposition to Defendants' [*sic*] Summary Judgment Motion" [Doc. 81-2], and a "Declaration in Opposition to Defendants' Motion for Summary Judgment," submitted under penalty of perjury [Doc. 81-1]. As such, Plaintiff's evidentiary forecast now before the Court includes Plaintiff's Declarations [Docs. 73-4, 81-1], which are largely duplicative, and the medical records Plaintiff filed in support of his summary judgment motion [Docs. 73-5 through 75-8].[3]

---

[3] Because Plaintiff's summary judgment materials have no tendency to show that Plaintiff is entitled to judgment as a matter of law, the Court declines to address them in that posture. The Court also notes that, in support of his summary judgment motion, the Plaintiff alleged new ways in which he contends Dr. Kalinski was deliberately indifferent, which the Court addresses below.

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material only if it might affect the outcome of the suit under governing law.  Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party.  The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Id. at 322 n.3.  The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment.  Id. at 324.  Rather, the nonmoving party must oppose a proper summary judgment motion with citation to

5

"depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" in the record.  See id.; Fed. R. Civ. P. 56(c)(1)(a).  Namely, the nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party.  Anderson, 477 U.S. at 255.  "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'"  Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  "[I]n determining whether a prisoner has received adequate medical treatment, the federal court is entitled to rely on the physician's affidavit and prison medical records kept in the ordinary course of operation."  Stokes v. Hurdle, 393 F. Supp. 757, 762-63 (4th Cir. 1975), affirmed, 535 F.2d 1250 (4th Cir. 1976) (citations omitted).  "In short, if it appears from the record that the prison medical authorities have made a sincere and

reasonable effort to handle the prisoner's medical problems, the constitutional requirements have been met." Id. at 763.

For the sake of clarity, the Court will first present the facts alleged by Plaintiff in his Amended Complaint, then present Defendant's forecast of evidence, and finally examine any potential genuine issues of facts raised by Plaintiff's forecast of evidence, as the non-movant.

## III. FACTUAL BACKGROUND

### A. Plaintiff's Allegations

In support of his claim for deliberate indifference to Plaintiff's serious medical needs against Dr. Kalinski, Plaintiff alleges as follows.

On May 6, 2016, Plaintiff was transferred from Central Prison to Alexander. [Doc. 12-1 at 1]. While at Central Prison, Plaintiff was being treated for migraines, and neck, back, and hand injuries. [Id.]. Plaintiff's left hand had a "locked index finger" and Plaintiff had been approved for occupational therapy, which the Central Prison doctors were using to determine whether Plaintiff would benefit from surgery. [Id.]. Once Plaintiff arrived at Alexander, however, Dr. Kalinski discontinued "all of the Central Prison orders" for Plaintiff, "including but not limited to M.R.I. prepping the

7

Plaintiff for surgery and the [Utilization Review Request4 (UR)-] approved occupational therapy."  [Id.].

On December 4, 2016, a drainage pipe in Plaintiff's housing unit burst, flooding Plaintiff's entire unit.  Plaintiff fell as a result of the water, sustaining injuries to his neck, back, pelvis, hips, and right hand.  [Id.].  The next day Plaintiff had an "emergency encounter" with Nurse Mary E. Stikeleather, RN, who contacted Marilyn Gamewell, FNP, and told Gamewell that Plaintiff should have been taken to an outside hospital the day before.  [Id. 1-2].  In response, Gamewell told Nurse Stikeleather that in order for Plaintiff to be seen at an outside hospital, he would "need to be seen by the provider." Plaintiff was not seen by Dr. Kalinski or any doctor for the injuries he suffered the day before despite his numerous sick call encounters and despite numerous different sick call nurses referring Plaintiff "to be seen and examined by Defendant Dr. Marta Kalinski, M.D., with the Plaintiff not being examined, reexamined or otherwise reevaluated for his injuries."  [Id. at 2].

On January 19, 2017, Dr. Kalinski "with evil intent and motivation" decreased Plaintiff's pain medications, which Plaintiff needed for treatment

---

4 A Utilization Review Request (UR) must be submitted by the facility providers for any service that requires precertification or prior authorization. Precertification and authorization are necessary to confirm eligibility for and obtaining an authorization number prior to scheduled inpatient admissions and "selected ambulatory procedures and specialty consult services."  [Doc. 73-8 at 2: NCDPS Health Services Policy & Procedure Manual, Utilization Management Policies].

of his chronic pain. [Id.]. On January 22, 2017, Plaintiff sustained further injuries when he fell on water caused by a leak in the sink in Plaintiff's cell. When he fell, Plaintiff was knocked unconscious and taken to Catawba Valley Medical Center (CVMC) for treatment. Plaintiff sustained injuries to his neck and back and head trauma. The emergency room physician, Jon A. Giometti, M.D., referred Plaintiff to care by his "Primary Care Provider" at Alexander, "with the Defendant Dr. Marta M. Kalinski, M.D. refusing to examine, reexamine or otherwise reevaluate the Plaintiff." [Id. at 3].

On June 27, 2017, Dr. Kalinski again discontinued orders by the Central Prison doctors for occupational therapy, which was again being used to determine whether Plaintiff would benefit from surgery on his left index finger. [Id. at 3-4].

On September 22, 2017, Plaintiff found out during a session with a physical therapist that Plaintiff "has fractures in his neck," when the physical therapist reviewed the results of Plaintiff's February 2017 MRI at Central Prison. [Id. at 4]. In January 2018, Dr. Kalinski again discontinued an order from a Central Prison doctor for Plaintiff's occupational therapy. [Id.]. Also in January 2018, Dr. Kalinski discontinued Plaintiff's prescription for Tramadol 300 mg, which was ordered by a Central Prison doctor and recommended by "UNCH [University of North Carolina Hospitals] Neurosurg

Pain Clinic," and needed by Plaintiff for treatment of his "constant severe chronic pain." [Id. at 5].

On October 6, 2016; October 18, 2016; October 12, 2017; November 1, 2017; May 4, 2018; and May 16, 2018, Plaintiff was told by medical staff that his appointments scheduled for these days with Dr. Kalinski would have to be "rescheduled due to an emergency or some other excuse." [Id. at 4]. Plaintiff included with his Amended Complaint the Declaration of Calvin Metcalf, a fellow inmate at Alexander.[5] [Doc. 12-3]. Metcalf attested that, on May 4, 2018, he accompanied Plaintiff to a medical appointment scheduled with Dr. Kalinski and that Plaintiff was told that "due to an unexpected emergency that the provider Dr. Marta M. Kalinski, M.D. had to leave and that his appointment would have to be rescheduled." [Id. at 1-2]. Metcalf also attests that, at this time, a Nursing Supervisor explained to Plaintiff that Dr. Kalinski had "reordered" Plaintiff's Gabapentin medication for Plaintiff's nerve pain. Metcalf attests that this "turned out to be a lie and false, because, at medication time inmate Goulette did not receive any of his pain medications." [Id. at 2]. The Nursing Supervisor also explained to

_____

[5] Metcalf's Declaration appears to be written in Plaintiff's handwriting, including Metcalf's name written at the end of the Declaration. Metcalf's signature appears nowhere on the Declaration. [See Doc. 12-3]. Because this Affidavit does not create an issue of fact, the Court need not address whether it can or should be considered given its insufficiencies.

Plaintiff that "his UR approved appointment at the UNCH Neurosurgery Clinic for his pending evaluation for neck and back surgery had still not been scheduled." [Id.].

Finally, Plaintiff generally alleges that Dr. Kalinski has failed to "examine," "reexamine," or "otherwise reevaluate [his] medical conditions and ailments." Plaintiff claims that Dr. Kalinski's delay in treating Plaintiff's serious medical needs "has caused [him] to suffer permanent injuries including nerve damage, partial paralysis, prolonged neck and back pain, dizziness, recurring chronic migraines, difficulty multitasking along with the bottom disc in [his] lower back having now severely narrowed, causing [Plaintiff] severe sciatica and severe pain in [his] back and legs with back spasms." [Id. at 6].

### B.    Defendants' Forecast of Evidence

Defendant's forecast of evidence tends to show the following. Dr. Kalinski is licensed to practice medicine in North Carolina and has been practicing medicine for over 20 years. [Doc. 78 at ¶ 2: Declaration of Marta Kalinski, M.D.]. At all relevant times, Dr. Kalinski was employed by the N.C. Department of Corrections and/or the N.C. Department of Public Safety. [Id.].

On May 6, 2016, Plaintiff was transferred from Central Prison to Alexander. [Id. at ¶ 5]. On the same day, Sarah Crubaugh, RN, performed a health screen on Plaintiff. [Doc. 78-5 at 2-6]. Nurse Crubough noted that Plaintiff "questions about where he is in the status of his Surgical consult and stated that he had originally had a pending appointment for MRI?" [Id. at 6]. Dr. Kalinski reviewed the record of the health screen shortly after it was concluded. [See id. at 6-7]. She noted: "Patient arrived to Alexander from CP. Unfortunately, patient came with just Tramadol 50 mg #4 tabs. Other medications he is on did not arrive with patient. Since today is Friday, we will need to obtain 5 days supply from the local pharmacy to maintain patient's current medical problems controlled." [Id. at 7]. Dr. Kalinski entered new medication orders for CarBAMazepine (for tension-type headache and chronic pain due to trauma), Gabapentin (for chronic pain due to trauma and lumbrosacral spondylosis[6] without myelopathy[7]), Propranolol HCl CR (for tension-type headache), and Lithium Carbonate (for bipolar I disorder). [Id. at 7-8]. The medical record reflects that Dr. Kalinski placed a separate order for 15 tablets of Tramadol from a local pharmacy so there would be no lapse in Plaintiff's access to this medication. [Id. at 10].

---

[6] A general term for age-related wear and tear of the spinal disks.

[7] Compression of the spinal cord.

On December 4, 2016, Plaintiff "fell and hit [his] hand." [Doc. 78-26 at 2]. He was first assessed within 30 minutes of the fall by Edgar Onia, RN. [Id.]. Nurse Onia examined Plaintiff and noted as follows:

> Offender was found in sitting position on floor with back supported by sink. Reports that he fell while attempting to ambulate to cell door to give another inmate a Stryfoam cup that was held in left hand and with cane in right hand. NO paresthesias for upper and lower extremities. Reports pain in right hand. Contusion with elevated bump noted dorsal aspect right hand at 1st and second metacarpals/distal phalanges. Has good capillary refill and has limited [range of motion] which he reports as normal finding due to his arthritis. Denies seizure, dizziness or [loss of consciousness] at the time of falling but reports mild dizziness now. Offender was able to return to wheelchair with assistance. Plan is for joint trauma protocol. Issued ice pack and instructions for hand care.

[Doc. 78-26 at 3]. Plaintiff was seen in follow-up the next day by Mary Stikeleather, RN. [Doc. 78-27 at 5-7]. At this visit Plaintiff complained of pain in his right hand, left hip, and buttocks. [Id. at 5]. Based on Plaintiff's symptoms, Nurse Strikeleather directed Nurse Tilley "to have patient referred to provider." [Id. at 6]. On December 7, 2016, apparently before this referral visit occurred, Plaintiff was evaluated by Grace Williams, LPN, at the Restrictive Housing Unit. Plaintiff had been in a fight and his right hand "[was] hurting again." [Id. at 2]. Plaintiff's right hand was x-rayed, and the

13

results were "unremarkable." [Id. at 4, 6]. FNP Gamewell reviewed and co-signed this care. [See id. at 4, 7].

On January 19, 2017, FNP Gamewell noted that Plaintiff refused a blood draw to test for Tramadol and Gabapentin levels and was, therefore, in violation of his pain contract. [Doc. 78-28 at 10]. As a result, Gamewell discontinued both these medications. [Id.]. It appears that, on January 31, 2017, Gamewell ordered that Plaintiff's Tramadol prescription be renewed. [See id. at 12].

On January 22, 2017, Plaintiff sustained another fall in his cell. [See Doc. 78-29 at 2-3]. Plaintiff was evaluated within 30 minutes of the fall by Marionne Hicks, RN. [Id. at 2]. Given Plaintiff's injuries, Dr. Uhren was called and Plaintiff was ordered to the local emergency room for further evaluation. [Id. at 3]. Plaintiff was transported to CVMC, where he was examined in the emergency room by Jon Giometti, M.D. [Id. at 7-10]. Dr. Giometti ordered x-rays of Plaintiff's spine and CT scans of Plaintiff's head and spine, all of which were negative for acute findings. [Id. at 8-9, 11-12, 14]. Plaintiff was diagnosed with a head contusion and discharged in "improved" condition. He was instructed to use a cool compress on his forehead and Tylenol or Motrin, if needed. [Id. at 9]. On return to Alexander on the morning of January 23, 2017, Plaintiff was seen by Thomas Bell, RN. [Id. at 16-17].

14

Nurse Bell noted "no significant findings" and that Plaintiff was in "no apparent distress." [Id. at 17].

On February 22, 2017, Plaintiff was transported to Central Prison for an MRI of his cervical spine. [Doc. 78-30 at 2; Doc. 78 at ¶ 37]. Plaintiff was found to have "straightening of normal cervical spine curvature" and "moderate multilevel spondylosis." [Id.]. This MRI did not reveal any fractures. [Doc. 78 at ¶ 42]. Plaintiff had a physical therapy session at Alexander on September 22, 2017. [Doc. 78-34 at 47]. The physical therapist did not mention Plaintiff's February 2017 MRI results in his notes from that session. [See id.; Doc. 78 at ¶ 42].

On April 4, 2017, Plaintiff was transferred from Alexander to Central Prison for mental health treatment. [Doc. 73-5 at 196]. He remained there until May 26, 2017, when he returned to Alexander. [Doc. 78-2 at 2].

On June 27, 2017, after Plaintiff's return from Central Prison, Dr. Kalinski entered an administrative note in Plaintiff's medical record stating that, "Alexander does not have [occupational therapy]. UR for this consultation will be [discontinued]." [Doc. 78-33 at 2]. Plaintiff's medical record reflected that Plaintiff was an "[o]ffender with locked index finger on left hand, was previously being seen by [occupational therapy] but was transferred before his sessions were completed." [Id. at 3].

On December 8, 2017, Plaintiff was noted to be manic, non-compliant with his medications, and having aggression and "difficulty stopping violence" when off his medications. [Doc. 78-35 at 95]. Plaintiff was again sent to Central Prison for inmate mental health treatment the next day. [Doc. 78-2 at 2; Doc. 78-35 at 99; Doc. 78 at ¶ 43]. On January 12, 2018, Plaintiff was examined by Robert Fearnot, M.D., a psychiatrist, while at Central Prison. [Doc. 78-35 at 108-109]. Dr. Fearnot noted, in part, as follows:

> Patient continued to go into a tirade about how he felt that he was getting the run around by medical and that he was being seen by various doctors who cancelled previous treatment. He showed me a progress note from a provider dated June of last year which referred back to OT. He claimed that the note indicated that he did not need OT. Writer underline[d] the section of the progress note which indicated that he was being referred back to OT since he claimed that he could not see without his glasses. He went into a tirade about this stating that it is [a] legal document which could not be underlined[.] Offered to reprint a copy of him. Patient went on [about] how nobody wanted to help him and how he was going [to] break necks once off of lock up.

[Id. at 108]. Dr. Fearnot ordered that Plaintiff be discharged, noting "he has reached maximum benefit of mental health care since all of his concerns at this time are related to medical problems." [Id.]. Plaintiff, however, could not be discharged immediately because he had been placed "on seclusion because of his anger outbursts and threats to harm someone once he comes

16

out of his cell." [Id. at 85]. Plaintiff was discharged from the mental health unit at Central Prison a week later and returned to Alexander, where he was returned to Restrictive Housing.[8] [Doc. 78 at ¶ 44].

On Plaintiff's return to Alexander, Lisa Putt, RN, performed a health screen on Plaintiff. [See Doc. 78-35 at 112-117]. In the record for this encounter, Nurse Putt noted that Plaintiff "was confused as to why he was sent back to this camp when he was sent to [Central Prison] for [occupational therapy]." [Id. at 113]. Plaintiff's chart was not referred to Dr. Kalinski in January 2018. Further, Dr. Kalinski did not discontinue any order for occupational therapy in January 2018 nor was occupational therapy available at Alexander in any event. [Doc. 78 at ¶ 44]. Dr. Kalinski is also not involved in determining where inmates are housed. [Id.]. Finally, Dr. Kalinski did not discontinue Plaintiff's Tramadol prescription in January 2018, as claimed by Plaintiff. [See Doc. 78 at ¶ 43; Doc. 78-36].

On February 20, 2018, Plaintiff's chart was inadvertently referred to Dr. Kalinski for a routine renewal order for Tramadol even though Plaintiff was

---

[8] Dr. Kalinski did not routinely provide care to inmates in Restrictive Housing during the relevant times. [Doc. 78 at ¶ 43]. On limited occasions or by error, nurses would refer a chart of a Restrictive Housing inmate to Dr. Kalinski to review or to co-sign for a specific concern. When that occurred, Dr. Kalinski would review the chart for the specific concern and/or co-sign the chart, including renewing medications, as necessary, rather than referring the chart to Restrictive Housing Unit providers. [Id. at ¶ 43].

in Restrictive Housing.  [Doc. 78 at ¶ 45].  In an effort to provide Plaintiff with the care he needed without delay, Dr. Kalinski renewed Plaintiff's Tramadol prescription, but only for 15 days, until the effects of Plaintiff's recent paraspinal injections could be evaluated.[9]  [Doc. 78 at ¶ 45; Doc. 78-37 at 2].

On May 17, 2018, Plaintiff was examined by Vickie Yaber, LPN, after a fall Plaintiff sustained after "walking back from the pill line."  [Doc. 78-45 at 2]. At this visit, Plaintiff reported pain in his left hip, lower back, and neck, but the pain was "the same as prior to [the] fall."  [Id. at 2, 5].  Plaintiff also reported muscle spasms in his lower back, that he was unable to walk long distances without difficulty, and that he was too dizzy to stand after the fall. [Id. at 5].  Dr. Uhren approved Nurse Yarber's recommendation to send Plaintiff to Catawba Valley Medical Center emergency room for further evaluation.  [Id.].

As to Plaintiff's alleged appointments with Dr. Kalinski that he claims were rescheduled due to emergencies or "some other excuse," Defendant's forecast of evidence shows the following.  On October 6, 2016, while Plaintiff was in the pill line, he requested that he be provided with a cane.  [Doc. 78-18 at 2].  Kelly Porter, RN, recorded this request.  [See id.].  Within an hour

---

[9] On February 13, 2018, Plaintiff was transported to UNCH to receive cervical and lumbar epidural injections and returned to Alexander without complication.  [Doc. 78 at ¶ 45 n.29; see Doc. 78-39 at 4-7].

of Nurse Porter's note on Plaintiff's request, Dr. Kalinski evaluated the request and noted that a "cane has been assigned to patient without day of expiration." Dr. Kalinski noted, "[plaintiff] should have a cane and use it for short distance and use a wheelchair for longer distances." [Id. at 4]. Later that day, Plaintiff was seen at the medical clinic by FNP Gamewell, complaining of needing new orthopedic shoes because his current pair were from 2014 and "they sick." [Id. at 5]. As a result of this request, FNP Gamewell made an UR for approval of new orthopedic shoes for Plaintiff. [Id. at 7].

On October 18, 2016, Sarah Wilson, LPN, recorded an administrative note in Plaintiff's chart, noting that, "Pts complaints are being address. UR has been approved for neuro consult. Nursing note has been forwarded to Kalinski for cane, and a chart review will be submitted with this encounter for renewal of migraine medication." [Doc. 78-21 at 2]. A few hours later Plaintiff was seen at the medical clinic by FNP Gamewell, complaining of wanting his cane and migraine medication renewed. Gamewell also noted that Plaintiff stopped taking his lithium "months ago because he read it could cause thyroid cancer." [Id. at 3-5]. At this visit, Plaintiff told Gamewell that he was being threatened by other inmates for his Gabapentin, but that he had not told anyone because "he doesn't want to be called a snitch." [Id. at 4].

Other administrative notes recorded on October 18, 2016 provide that Plaintiff was seen the day before by FNP Gamewell after a fall on October 17, 2016, that Plaintiff's "concerns [were] addressed at that time," and that Plaintiff's chart was removed from Dr. Kalinski's provider co-signature list. [Id. at 11-12].

On October 26, 2016, a check of Plaintiff's Gabapentin level revealed that his level was lower than it should have been had Plaintiff been taking his Gabapentin as prescribed. [See id. at 8]. On November 1, 2016 Gamewell reviewed these results and ordered that Plaintiff's Gabapentin and Tramadol levels be checked in one month and noted that, if they are low, these medications will be discontinued. [Doc. 78-24 at 3]. Plaintiff was advised that his levels would be monitored. [Id.].

On October 12, 2017, Plaintiff was seen by FNP Gamewell at the medical clinic to "discuss returning to UNCH spine center for re-eval of his chronic back and neck pain." [Doc. 78-34 at 52]. Gamewell also noted that Plaintiff "has numerous requests, each will be discussed and granted if possible. [H]e is very verbal and jovial in clinic. [He] wants his cane back so he can get out of the wheelchair more. [A]nother can[e] was given to him as he lost his when he went to [segregation]." [Id. at 52]. Gamewell entered an

UR for Plaintiff "to return to the UNC Spine CTR Neurosurgery for continued neck and lower back pain."[10]  [Id. at 53, 56].

### C.  Plaintiff's Forecast of Evidence

As noted, Plaintiff submitted 648 pages of his medical record.  Plaintiff also submitted Declarations in which he makes blanket, bare assertions regarding Dr. Kalinski's alleged care or lack of care that are unsupported by the medical record on which he relies.  [See Docs. 73-4, 81-1].

Plaintiff asserts that Dr. Kalinski failed to see him in follow up after he returned from CVMC for emergent care related to his January 22, 2017 fall.  [Doc. 73-4 at ¶ 34].  The forecast of evidence, however, shows that Plaintiff was seen in follow up by another provider.  Moreover, Plaintiff forecasts no evidence that Dr. Kalinski was supposed to see Plaintiff in follow up.  Furthermore, Plaintiff was diagnosed with only a contusion due to this fall and he has not forecast evidence that any alleged lack of follow up care by Dr. Kalinski or otherwise constitutes deliberate indifference to a serious medical need.

Plaintiff's forecast of evidence also includes a Declaration of fellow inmate Jamol Dixon, who attests that he accompanied Plaintiff to Plaintiff's

---

[10] As to the remaining dates on which Plaintiff claims his appointments with Dr. Kalinski were rescheduled, the medical record does not reflect that Plaintiff received medical care on or about November 1, 2017; May 4, 2018; or May 16, 2018 by Dr. Kalinksi or otherwise.

September 22, 2017 physical therapy appointment and that the physical therapist told Plaintiff that "he had fractures in his neck that M.R.I. results had confirmed." [Doc. 73-6 at 45]. Dixon further attests that the physical therapy "got out a medical book" and showed Dixon and Plaintiff "the kind of fractures he has to his neck and the damage the fractures have and can cause." [Id. at 45-46]. Plaintiff's forecast of evidence, however, does not contain any MRI report reflecting findings of neck fractures.

Plaintiff also alleges that, on December 1, 2017, Dr. Kalinski "unjustly" discontinued Plaintiff's pain medication, Tramadol. Plaintiff also attests that on other occasions, Dr. Kalinski discontinued Plaintiff's Tramadol and Gabapentin. [See Doc. 73-4 at ¶¶ 36, 37, 39, 40]. Plaintiff's forecast of evidence in support of these claims, however, does not reflect any such action taken or directed by Dr. Kalinski. [See Doc. 73-5 at 160, 239-46, 251-54, 258-74; Doc. 73-8 at 39-119]. Much of the care referenced by Plaintiff was provided by FNP Gamewell and other providers, not Dr. Kalinski, and none of the Plaintiff's records reflect any "unjust" action relative to Plaintiff's medications. [See id.].

Plaintiff's forecast of evidence also shows that on February 12, 2018, Plaintiff went to the UNCH pain clinic for epidural steroid injections. [Doc. 73-8 at 84]. As described in Defendant's forecast of evidence, Dr. Kalinski

ordered a 15-day supply of Tramadol for Plaintiff on February 26, 2018 "until the effects of paraspinal injection are evaluated." [Doc. 73-5 at 258]. On March 13, 2018, Plaintiff filed a grievance to have his "300 mg tramadol pain medication to be renewed." [Id. at 259]. The Step One grievance response directed Plaintiff to submit a sick call regarding his concerns. [Id. at 261-63]. Thereafter, Plaintiff filed numerous sick call requests, but then apparently "refused [his] sick calls dated 4/8/2018, 4/9/2018 & 4/14/2018 to address these medical concerns." [Doc. 73-8 at 85]. On April 23, 2018, Plaintiff submitted another sick call request. He requested renewal of his pain medications, including Gabapentin, Tramadol, Mobic, and Imitrex. [Id. at 88]. The next day, James Johnson, NP, entered a medication renewal for Mobic and Imitrex (Sumatriptan) and an UR request for Gabapentin. Dr. Kalinski cosigned this order on May 14, 2018.[11] [Id. at 89-91].

Plaintiff alleges in his Complaint that Dr. Kalinski conspired with others "on numerous different occasions" by removing Plaintiff from his scheduled appointments with Dr. Kalinski. [Doc. 73-4 at ¶ 42]. Plaintiff further alleges that "Defendant Kalinski and her co-conspirators would alway's [*sic*] come

---

[11] Dr. Kalinski's forecast of evidence shows that her review of Plaintiff's chart was duplicative of FNP Gamewell's review and that Dr. Kalinski noted in reviewing the order that Plaintiff "has active orders for: gabapentin, Mobic, and Sumatriptan" and the "[o]rder for Tramadol was temporary." [Doc. 78-44 at 3; Doc. 78 at ¶ 50].

up with lies and excuses as to why [Plaintiff] would not be able to be seen."

[Id.].  Plaintiff's forecast of evidence, however, fails to support these bare claims.

Plaintiff also now contends, for the first time, that he is "ADA Assigned with multiple restrictions" and that Dr. Kalinski "would not allow [him] to have [his] Central Prison doctor ordered handicap items and assistive devices" that Plaintiff needed.  [Doc. 73-4 at ¶ 41].  He also claims that Dr. Kalinski violated the NCDOC Health Services Policy & Procedure Manual policies on Utilization Management and Chronic Pain.  [Id. at ¶¶ 47-48].  Plaintiff, however, presents no forecast of evidence supporting such allegations.

This matter is now ripe for disposition.

## IV.   DISCUSSION

Claims under 42 U.S.C. § 1983 based on an alleged lack of or inappropriate medical treatment fall within the Eighth Amendment's prohibition against cruel and unusual punishment.  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  To state a claim under the Eighth Amendment, a plaintiff must show a "deliberate indifference to serious medical needs" of the inmate.  Id.  "Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need

for medical care." Young v. City of Mt. Ranier, 238 F.3d 567, 575-76 (4th Cir. 2001) (citations omitted).  "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990).

Allegations that might be sufficient to support negligence and medical malpractice claims do not, without more, rise to the level of a cognizable Section 1983 claim.  Estelle, 429 U.S. at 106; Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it.").  "[E]ven if a prison doctor is mistaken or negligent in his diagnosis or treatment, no constitutional issue is raised absent evidence of abuse, intentional mistreatment, or denial of medical attention." Stokes v. Hurdle, 393 F. Supp. 757, 762 (D. Md. 1975), aff'd, 535 F.2d 1250 (4th Cir. 1976).  Further, the constitutional right is to medical care.  No right exists to the type or scope of care desired by the individual prisoner.  Id. at 763.  Therefore, a disagreement "between an inmate and a physician over the inmate's proper medical care [does] not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (dismissing the plaintiff's § 1983

claim against a defendant physician for allegedly discharging the plaintiff too early from a medical clinic, as such claim did not rise to the level of deliberate indifference but would, "at most, constitute a claim of medical malpractice").

To succeed on a claim against Dr. Kalinski under the Eighth Amendment, Plaintiff must show a deliberate indifference to Plaintiff's serious medical needs. <u>Estelle</u>, 429 U.S. at 104. To establish such indifference, the "treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscious or to be intolerable to fundamental fairness." <u>Miltier</u>, 896 F.2d at 851. Absent exceptional circumstances, a disagreement between a prisoner and a physician over the prisoner's proper medical care is not grounds for a § 1983 claim. <u>Wright</u>, 766 F.2d at 849.

Here, the forecast of evidence shows, at best, disagreement between Plaintiff and Dr. Kalinkski regarding discreet instances of Plaintiff's medical care at Alexander during the relevant times.[12] <u>See</u> <u>Wright</u>, 766 F.2d at 849.

---

[12] It is worth noting that Plaintiff's extensive medical record is before the Court. It belies many of Plaintiff's mischaracterizations and misstatements of Plaintiff's medical care. For instance, on numerous occasions, Plaintiff alleges malfeasance by Dr. Kalinski when she was not even the medical provider charged with his care. Whatever the reason for the inconsistencies between certain allegations and Plaintiff's medical record, Plaintiff's attempt to contradict what he himself submits as his medical record is insufficient to create a genuine issue of material fact in this case. <u>See</u> <u>Green v. Orangeburg Calhoun Detention Center</u>, No. 0:13-623-MGL, 2014 WL 4063328, at *4 (D.S.C. Aug. 12, 2014) (finding prisoner plaintiff's unsupported assertions did not create a genuine issue of fact where the plaintiff's medical record demonstrated no deliberate indifference to the plaintiff's serious medical needs).

Namely, the forecast of evidence shows that Dr. Kalinski addressed Plaintiff's medical needs whenever feasible when she was the provider charged with his care, and that Plaintiff simply wanted Dr. Kalinski to prescribe and provide different or additional treatment than he received. Specifically, Plaintiff believed that Dr. Kalinski wrongly discontinued his occupational therapy when he returned from Central Prison, despite the fact that occupational therapy was not available at Alexander in the first place. Plaintiff also believed that Dr. Kalinski "unjustly" discontinued his pain medications on different occasions when, in reality, any minimal limitation placed on Plaintiff's medications by Dr. Kalinski was explained and supported in the medical record. Plaintiff also complains that he did not receive care by Dr. Kalinski after he sustained certain injuries. The forecast of evidence, however, shows that Plaintiff received adequate care in these instances, if only by other healthcare providers.

Plaintiff also faults Dr. Kalinski for having to reschedule medical appointments in the face of prison medical emergencies. The forecast of evidence shows, however, that Plaintiff was seen by other providers on or shortly after the dates of most of these alleged missed appointments. Furthermore, even if Plaintiff's appointments on some of these dates were, in fact, rescheduled, Plaintiff has failed to forecast evidence that Dr. Kalinski

was deliberately indifferent to a serious medical need at these times. Namely, Plaintiff has not shown that he was experiencing a serious medical need that was not addressed due to these alleged missed appointments. Nor has he forecast any evidence that Dr. Kalinski was aware of any such need or that she acted with deliberate indifference with respect thereto.

The forecast of evidence also reflects a misunderstanding by Plaintiff regarding the scope of Dr. Kalinski's duties and the medical care available to Plaintiff. It seems much of Plaintiff's claims are based on his incorrect belief that Dr. Kalinski was his personal primary care provider and owed him the care he desired in all instances. [See Doc. 73-4 at ¶ 26]. In short, the medical record reflects that Dr. Kalinski "made a sincere and reasonable effort to handle [Plaintiff's] medical problems" and, thus, "the constitutional requirements have been met." Stokes, 393 F. Supp. at 763.

In sum, the total forecast of evidence (consisting of over 1300 pages), taken in the light most favorable to the Plaintiff, does not support Plaintiff's assertion that Dr. Kalinski acted with "deliberate indifference" to Plaintiff's serious medical needs. See Estelle, 429 U.S. at 194, 97 S. Ct. at 285; Overman v. Wang, 801 Fed. App'x 109, 111-12 (4th Cir. 2020) (affirming judgment on bench trial finding prison doctor's treatment of prisoner's knee injury was reasonable given the prisoner's symptoms despite failure to

provide other, more advanced available treatment).  The forecast of evidence on Plaintiff's claims against Dr. Kalinski, therefore, is insufficient to go to a jury on a § 1983 claim under the Eighth Amendment.  Summary judgment is, therefore, appropriate.

Additionally, Dr. Kalinski is entitled to qualified immunity.  Qualified immunity shields "government officials performing discretionary functions … from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Because Plaintiff has failed to forecast sufficient evidence that Dr. Kalinski's conduct violated any constitutional right, Dr. Kalinski is entitled to qualified immunity.  See Pearson v. Callahan, 555 U.S. 223, 232 (2009).

## IV.  CONCLUSION

In sum, for the reasons stated herein, the Court denies Plaintiff's motion for summary judgment and grants summary judgment for Dr. Kalinski.

## ORDER

**IT IS, THEREFORE, ORDERED** that Plaintiff's Motion for Summary Judgment [Doc. 73] is **DENIED**; Defendant's Motion for Summary Judgment [Doc. 76] is **GRANTED**; and this action is dismissed with prejudice.

The Clerk is respectfully instructed to terminate this action.

Signed: January 13, 2021

Martin Reidinger
Chief United States District Judge